S

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO.: 1:14-CR-1-WLS |
| v. | Counts 1-30, 35-47: 18 U.S.C. §§ 1343, 1346 (Scheme to Deprive the United States of Money, Property, and Honest Services by Wire Fraud) |
| CHRISTOPHER WHITMAN, SHAWN MCCARTY, and BRADFORD NEWELL, | Counts 31-34, 48-50: 18 U.S.C. § 201 (Bribery) |
| Defendants. | Count 51: 18 U.S.C. § 641 (Theft of Government Property) |
| | Forfeiture Notice: 18 U.S.C. § 981; 28 U.S.C. § 2461 |

# INDICTMENT

THE GRAND JURY CHARGES:

1. The "relevant period" for purposes of this Indictment is from in or about January 2008 and continuing through to in or around June 2012. Unless stated otherwise, all events described herein occurred in or around the relevant period.

## GENERAL ALLEGATIONS

### Relevant Government and Government-Related Entities

2. The United States Marine Corps (USMC) is a branch of the United States Armed Forces, a component of the Department of Defense (DOD). The USMC is an expeditionary force, responsible for protecting the interests of the United States and the lives of its citizens through combat operations, humanitarian relief efforts, and other missions. Among the USMC's purposes is to serve as a rapid-response force prepared to swiftly and aggressively respond to crises. The 82d

United States Congress mandated that the USMC "be the most ready when the nation is generally least ready." Accordingly, the USMC is often referred to as the "the first to fight" among the Armed Forces. There are approximately 200,000 active duty Marines and 40,000 reserve Marines.

3. The Marine Corps Logistics Base (MCLB) in Albany, Georgia, is one of only two USMC installations within the United States that supports the USMC Logistics Command. The other is located in Barstow, California. MCLB-Albany's principal mission is to rebuild and repair ground combat and combat-support equipment and to support military installations on the United States East Coast. MCLB-Albany plays a pivotal role in the nation's defense, as much of the military equipment utilized in Afghanistan, Iraq, and other parts of the world is refurbished there. MCLB employs approximately 3,000 civilians, and approximately 400 Marines are stationed there.

4. The Defense Logistics Agency (DLA), a component of DOD, is a combat logistics support agency, providing the USMC and other Armed Forces, other federal agencies, and combined allied forces with logistic, acquisition, and technical services. DLA manages the re-utilization of military equipment and provides consumable items DOD and allied forces need to operate, including food, fuel, uniforms, medical supplies, spare parts, and construction equipment. DLA coordinates the transportation of these items to and from military bases and installations throughout the United States and the world, including in conflict theaters. DLA is headquartered at Fort Belvoir, Virginia, and maintains a presence at a majority of DOD installations worldwide, including MCLB-Albany.

5. Company A, based in Aurora, Illinois, is a logistics firm doing business with DOD that provides logistics support and supply-chain integration services. In February 2009, Company A and DLA officially implemented the Defense Transportation Coordination Initiative (DTCI) at MCLB-Albany, under which DLA was required to use Company A for logistics support, including

coordinating with and contracting private transportation services companies – *i.e.,* trucking companies – to move DOD freight to destination.

6. At MCLB-Albany, the DLA Traffic Office plans and arranges for the transportation of USMC freight. Under DTCI, the DLA Traffic Office assembled freight loads and transmitted delivery-cycle time, equipment, and other shipping specifications to Company A, and Company A secured transportation.

7. PowerTrack/Syncada is an electronic system administered by a bank that interfaces with DLA, Company A, and private transportation companies to track freight transactions and process billings and payments. DOD mandated that private carriers of DOD freight register for and use PowerTrack/Syncada to certify the completion of transportation services, bill DOD, and receive payments. Electronic payments processed by PowerTrack/Syncada are wired through one of the bank's two automated clearinghouses, located in Minneapolis, Minnesota, and Fargo, North Dakota.

8. The Fleet Support Division (FSD), a component of the USMC Logistics Command's Distribution Management Center at MCLB-Albany, is responsible for the storage, care, inventory, and distribution of surplus equipment. Most of the surplus equipment sent to MCLB-Albany was designated either to be rehabilitated, repaired, and redistributed to the Fleet Marine Corps, or to be demilitarized and disposed of through sale or destruction. A substantial portion of the surplus equipment inventory comprises heavy-engineering equipment, such as bulldozers, cranes, and front-end loaders.

**Relevant Public Officials**

9. Mitchell Potts was the supervisor of the DLA Traffic Office at MCLB-Albany. Potts was responsible for managing DLA freight shipments, including coordinating with Company A and

privately owned companies doing business with DLA and Company A; supervising approximately five Transportation Assistants who planned freight transportation logistics; and supervising approximately eight Load Technicians that load freight onto privately operated trailers contracted to fulfill transportation orders.

10. Defendant SHAWN MCCARTY was a Transportation Assistant in the DLA Traffic Office at MCLB-Albany, working under Potts. Transportation Assistants were responsible for handling transportation logistics, which involved: planning how freight should be shipped, including how many and what type of trailers should be used to complete a shipment; securing freight transportation directly or through Company A; and preparing government bills of lading (GBLs) setting forth freight shipping specifications. MCCARTY also owned and operated CST Construction, a small private construction and company.

11. Jeffrey Philpot was a Transportation Assistant in the DLA Traffic Office at MCLB-Albany, working under Potts. In 2009, Philpot was promoted to the position of Lead Transportation Assistant, after which he maintained the responsibilities of a Transportation Assistant, while also serving as a resource for information and expertise to other Transportation Assistants.

12. Shelby Janes was the Inventory Control Manager of FSD at MCLB-Albany. Janes's responsibilities included overseeing approximately eight employees in the inventorying of surplus equipment returning to MCLB-Albany from the Fleet Marine Corps, as well as completing government paperwork, such as DOD Form 1348, which authorizes the movement of surplus equipment to fulfill USMC equipment requisitions. Janes retired on December 31, 2010. Janes also owned and operated Studhaven Farms, a small private company that performed services such as hay bailing.

13. Defendant BRADFORD NEWELL was employed as a contractor working on inventory-related tasks within FSD under Janes. NEWELL left this position in or around June 2010. NEWELL also co-owned and operated B&C Sporting Goods, a sporting goods store.

**Christopher Whitman and United Logistics**

14. Defendant CHRISTOPHER WHITMAN was the founder, co-owner, and chief operator of United Industrial of Georgia, Inc., and its affiliated entity, ZMK Trucking.

15. United Industrial of Georgia, Inc., also known as United Logistics (hereinafter "ULOC"), including its affiliated entity ZMK Trucking (hereinafter "ZMKT") and other affiliated entities, is a trucking company and transportation broker in Albany, Georgia. ULOC became eligible to do business with DLA in or around January 2008 by satisfying the requirements of the Freight Carrier Registration Program (FCRP) managed by the Military Surface Deployment and Distribution Command (SDDC). In November 2008, ULOC executed a contract, the Master Co-Broker Agreement, with Company A, authorizing ULOC to bid on and receive DLA freight transportation orders managed by Company A, and to service those orders either directly or by brokering them to other trucking companies.

16. During approximately the first five months of 2008, ULOC's bank account never exceeded forty dollars and had a negative balance on or about June 1, 2008. Beginning the next month, and extending to the end of the relevant period, the United States paid ULOC nearly $38 million for transportation contracts resulting in gross profits to ULOC exceeding approximately $20 million.

17. In 2008, ULOC serviced less than 500 DLA transportation orders. By 2010, however, ULOC catapulted to DLA's first-ranked carrier at MCLB-Albany, servicing more than 7,500

transportation orders – more than half of the shipments leaving MCLB-Albany. ULOC's closest competitor that year, a company that provided global and domestic transportation services, was awarded fewer than 2,000 DLA shipments.

18. Kelli Durham was a ULOC employee reporting to WHITMAN and had the title of Manager. Under WHITMAN's direction, Durham was responsible for taking freight transportation orders from DLA and Company A, brokering those orders to third-party trucking companies, and billing the government, among other things.

19. Carroll Wayne Smith, is the owner and operator of Smith Farms, a business that buys, sells, and brokers the sale of farming and other equipment.

**Fiduciary Duties and Responsibilities**

20. Public officials within DOD, including DLA and FSD, owe a fiduciary duty to the United States and DOD, including its components, and to United States citizens to perform the duties and responsibilities of their offices in the best interest of DOD and the citizens of the United States.

## THE TRANSPORTATION SCHEME

## COUNTS ONE THROUGH THIRTY
**(Scheme to Deprive the United States of Money, Property, and Honest Services by Wire Fraud – 18 U.S.C. §§ 1343, 1346)**

21. From in or about January 2008 and continuing through to in or about June 2012, in the Middle District of Georgia, and elsewhere, the defendants,

**CHRISTOPHER WHITMAN and**
**SHAWN MCCARTY,**

and Durham, Potts, and Philpot, and others known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud the United States, including DOD and its

components, of money and property, and to defraud and deprive the United States, including DOD and its components, and the citizens of the United States of their right to the honest services of public officials Potts, Philpot, and MCCARTY through bribery.

**Purpose of the Scheme**

22. The purpose of the scheme was:

a. For WHITMAN and others known and unknown to enrich themselves through corruption by offering and providing things of value to DLA public officials in exchange for official action favorable to ULOC;

b. For Potts, Philpot, MCCARTY, and others known and unknown to use their official positions with DLA to enrich themselves through corruption by soliciting and accepting things of value from WHITMAN, in exchange for official action favorable to ULOC; and

c. For WHITMAN, Durham, Potts, Philpot, MCCARTY, and others known and unknown to enrich themselves through fraud by, among other things, cheating DLA, deceiving Company A, misleading trucking companies with which ULOC did business, and overbilling the United States.

**Manner and Means**

23. The manner and means of the scheme included, but were not limited to the following:

a. Defendant WHITMAN identified DLA public officials at MCLB-Albany who were well-positioned to help ULOC by virtue of their role in the process of planning freight shipments and awarding transportation contracts;

b. WHITMAN corrupted DLA by offering and providing things of value, including money, rare coins, collectible items, automobiles, fireams, home improvements, housing,

and meals, to DLA public officials, including Potts, Philpot, and MCCARTY, in exchange for official actions to benefit ULOC;

c. Potts, Philpot, and MCCARTY used their official positions to defraud DOD and benefit ULOC by, among other things, improperly awarding ULOC DLA freight transportation orders; limiting Company A's ability to select any company other than ULOC to fill DLA transportation orders; and planning overpriced transportation loads through unnecessary shipping specifications and premium-priced-service requirements; and

d. ULOC defrauded the United States by re-planning and consolidating DLA freight transportation orders without authorization and billing DOD for services it did not actually perform. Under WHITMAN's direction, ULOC combined multiple DLA loads into fewer loads and brokered trucking companies to ship them on trailers inferior to those ordered by DLA. When necessary to accomplish this, ULOC stored freight at its storage yard without authority and filled trailers beyond their intended capacity, sometimes causing USMC equipment to arrive at destination late and in damaged condition. In this way, ULOC caused the government to pay for multiple trucks that never actually traveled to destination and for premium trailers that were not actually used.

**Bribes Given to Public Officials**

24. WHITMAN gave Potts, directly and indirectly, things of value worth approximately $209,800, including but not limited to the following:

a. Beginning in or around January 2008 and continuing throughout the relevant period, WHITMAN periodically gave Potts gift cards to stores and restaurants in individual amounts in the hundreds of dollars;

b. Beginning in or around January 2008 and continuing throughout the relevant period, WHITMAN gave Potts individual cash payments of approximately $5,000 each, which he personally delivered in bank envelopes to Potts at the DLA Traffic Office;

c. On or about May 28, 2009, WHITMAN purchased a home from Potts and Potts's spouse by paying off the home's $110,000 mortgage;

d. On or about May 28, 2009, WHITMAN gave Potts $20,000 in cash;

e. Between on or about May 28, 2009, and on or about September 1, 2009, WHITMAN allowed Potts and his family to live in the home he had purchased from them without paying rent, at a value of approximately $4,400;

f. Separate and apart from the cash payments described in subparagraph 24(b), between in or around March 2009 and in or around September 2009, WHITMAN gave POTTS approximately $65,260 in cash; and

g. Separate from the cash payments described in subparagraph 24(b), in or around December 2011, WHITMAN gave Potts approximately $25,000 in cash, which WHITMAN called a "Christmas Bonus."

25. Beginning in or around May 2009 and continuing throughout the relevant period, WHITMAN gave Philpot, directly and indirectly, things of value worth approximately $523,662, including but not limited to the following:

a. Beginning in or around May 2009 and continuing throughout the relevant period, WHITMAN periodically gave Philpot gift cards to stores and restaurants in individual amounts in the hundreds of dollars, including a gift card to Philpot soon after he bought a new home in May 2009, which WHITMAN called a "housewarming gift";

b. Beginning in or around May 2010 and continuing throughout the relevant period, WHITMAN periodically gave Philpot cash payments of approximately $5,000 each, which he personally delivered in bank envelopes to Philpot at the DLA Traffic Office;

c. Between in or about May 2010 and in or about April 2011, WHITMAN gave Philpot a Wurlitzer jukebox;

d. On or about April 28, 2011, WHITMAN paid approximately $4,860 to a building materials store for supplies used to remodel Philpot's home;

e. On or about May 16, 2011, WHITMAN paid approximately $1,677 to a building materials store for supplies used to remodel Philpot's home;

f. On or about June 13, 2011, WHITMAN bought Philpot a "Baby Grand" piano for approximately $9,370;

g. On or about June 21, 2011, WHITMAN bought Philpot a gold Beatles' album for approximately $11,800;

h. On or about June 27, 2011, WHITMAN bought Philpot a 2000 Pontiac Trans Am for approximately $22,000;

i. On or about April 4, 2012, WHITMAN bought Philpot firearms for approximately $18,700; and

j. On or about the dates listed below, WHITMAN bought Philpot rare coins from vendors and dealers for a total of approximately $217,278, using checks drawn on a ULOC bank account, account number XXXXXXX4181, as follows:

| Date | ULOC Check No. | Approximate Amount |
|---|---|---|
| November 15, 2010 | 5210 | $5,011 |
| December 6, 2010 | 5606 | $33,260 |
| December 29, 2010 | 5604 | $11,775 |
| February 24, 2011 | 5849 | $4,400 |
| March 23, 2011 | 5987 | $10,433 |
| April 5, 2011 | 6056 | $5,529 |
| April 26, 2011 | 6148 | $5,050 |
| April 26, 2011 | 6149 | $3,995 |
| September 8, 2011 | 6601 | $29,650 |
| September 13, 2011 | 6602 | $9,000 |
| September 30, 2011 | 6691 | $35,978 |
| September 30, 2011 | 6692 | $27,850 |
| October 21, 2011 | 6752 | $13,500 |
| November 2, 2011 | 6767 | $6,372 |
| February 23, 2012 | 7111 | $7,600 |
| April 16, 2012 | 7265 | $8,900 |

26. In or about April or May 2012, after WHITMAN became aware of a law enforcement investigation of the scheme, WHITMAN instructed Philpot to return things of value he had given to Philpot, including but not limited to rare coins, a Wurlitzer jukebox, and a gold Beatles' album, to conceal their corrupt relationship.

27. Beginning in or about February 2010 and continuing throughout the relevant period, WHITMAN gave MCCARTY, directly and indirectly, things of value worth approximately $156,000, including but not limited to the following:

a. On or about February 18, 2010, WHITMAN paid approximately $909 to a an off-road motor dealer for parts for an all-terrain vehicle (ATV) belonging to MCCARTY;

b. Between in or about January 2011 and in or about May 2012, WHITMAN allowed MCCARTY to live in the home that he purchased from Potts and Potts's spouse without paying rent, a value of approximately $24,650;

c. On or about January 28, 2011, WHITMAN bought MCCARTY a 1990 Ford Mustang for approximately $11,919;

d. On or about April 27, 2011, WHITMAN paid CST Construction approximately $14,000;

e. On or about May 13, 2011, WHITMAN paid CST Construction approximately $5,200;

f. On or about May 27, 2011, WHITMAN paid CST Construction approximately $12,500;

g. On or about June 1, 2011, WHITMAN paid CST Construction approximately $11,300;

h. On or about June 7, 2011, WHITMAN paid CST Construction approximately $7,500;

i. On or about June 15, 2011, WHITMAN bought MCCARTY a 2011 Polaris Ranger Four-Wheel ATV and parts for approximately $16,262;

j. On or about June 30, 2011, WHITMAN paid approximately $2,777 to a speed shop for repairs to an automobile owned by MCCARTY;

k. On or about July 7, 2011, WHITMAN paid CST Construction approximately $21,800;

l. On or about July 26, 2011, WHITMAN paid CST Construction approximately $11,400;

m. On or about August 25, 2011, WHITMAN paid CST Construction approximately $8,800;

n. On or about October 20, 2011, WHITMAN bought MCCARTY a 1973 Volkswagen Super Beetle for approximately $3,200; and

o. On or about March 5, 2012, WHITMAN paid approximately $3,300 to a speed shop towards the purchase of a new motor for the 1973 Volkswagen Super Beetle he had previously purchased MCCARTY, as set forth in subparagraph 27(n).

28. Throughout the relevant period, WHITMAN routinely bought lunch for Potts, Philpot, MCCARTY, and other DLA employees. These lunches occurred as often as multiple times a week and ranged from sandwiches and pizza to steak lunches. Potts, Philpot, MCCARTY, and other DLA employees became so accustomed to this arrangement that they often called or emailed Durham to place their lunch orders.

29. To conceal WHITMAN's corrupt relationship with DLA officials, the things of value described in paragraphs 24 to 28 were recorded in the ULOC general ledger as transportation costs and other business-related expenses.

30. Between on or about March 29, 2010, and on or about July 13, 2011, WHITMAN gave an employee of Company A gift cards to stores and restaurants worth a total of approximately $1,500.

**Official Acts and Fraud**

31. In exchange for the things of value set forth in paragraphs 24 to 28, Potts, Philpot, and MCCARTY took official acts to defraud DOD and benefit ULOC, including but not limited to the following:

a. Delaying freight transportation orders for a period of hours, days, or weeks, then designating the orders as in need of "expedited pick-up," a premium-priced service. This substantially reduced the time available for Company A to fulfill orders and reduced the number of available carriers, virtually assuring that Company A would select ULOC, a local carrier. This also unnecessarily increased shipping costs to DOD, because expedited service is more expensive than regular service;

b. Alerting ULOC to forthcoming freight transportation orders before that information was provided to Company A or competitors, so that ULOC could position itself to be available to accept shipments, particularly those designated for "expedited pick up";

c. "Short loading" freight shipments so that it would appear to require more trailers than actually necessary to transport the freight to destination. This enhanced ULOC's opportunity to defraud DOD through load consolidation and increased shipping costs to DOD due to the unnecessarily high number of trailers requisitioned;

d. Designating shipments for "exclusive use," a premium service requiring that a shipment be transported independently, even if that results in a trailer not being filled to capacity. This designation prevented Company A from consolidating "short loads" and increased shipping costs to DOD;

e. Requiring that removable gooseneck (RGN) trailers, which load from the front and do not require use of a separate ramp, be used to transport freight, even when RGN trailers were not necessary. The RGN-trailer requirement increased shipping costs to DOD, because RGN trailers are less widely available;

f. Falsely representing to Company A that ULOC had the trailer capacity to consistently accept RGN-designated loads;

g. Allowing non-RGN trailers operated by ULOC to be loaded with freight designated for shipment on RGN trailers;

h. Authorizing ULOC trailers to depart MCLB-Albany carrying government freight without a GBL and allowing WHITMAN and other ULOC employees to pick them up at the end of the business day or the following day. This afforded ULOC the ability to transport freight to its storage yard more efficiently than competitors, which were often delayed waiting for GBLs, and helped assure its rapid availability to accept transportation orders;

i. Encouraging Company A to award freight transportation orders to ULOC by touting its availability and trailer capacity; and

j. Planning freight transportation orders so that they would not be subject to DTCI and awarding them directly to ULOC.

32. WHITMAN instructed Durham to accept any and all freight transportation orders offered by DLA or Company A from MCLB-Albany, regardless of whether ULOC had a truck available to deliver the shipment to destination. After Durham accepted a shipment, most times it would be picked up at MCLB-Albany by ULOC employees and transported to ULOC's storage yard

a few miles away, where it was offloaded. Oftentimes, ULOC would pick up multiple shipments from the base each day, using the same few trucks.

33. Without authorization, WHITMAN re-planned the DLA freight shipments at ULOC. Because DLA had short-loaded most of these shipments, there was substantial opportunity for ULOC to combine multiple loads onto fewer trucks, which WHITMAN directed ULOC employees to do. Furthermore, when ULOC received shipments designated for RGN trailers, WHITMAN directed that they be shipped instead on standard, less expensive trailers.

34. WHITMAN directed Durham to broker the re-planned, combined shipments to other trucking companies for delivery to destination, and to bill DOD under the more expensive specifications ordered by DLA. In so doing, ULOC repeatedly billed the government for multiple trucks that never traveled to destination, which WHITMAN and Durham referred to as "ghosts," for exclusive-use services never performed, and for RGN trailers that were never actually used.

35. Each unique shipment requisitioned by DLA had a single GBL setting forth shipping specifications, including the freight's weight, quantity, and serial numbers, and the type of trailer to be used. The majority of freight transportation orders offered to ULOC by DLA and Company A required a single truck, which therefore should have carried a single GBL. Due to WHITMAN's unauthorized load re-planning, trailers departing ULOC for destination routinely contained multiple unique shipments and thus multiple GBLs. These GBLs contained specifications, such as RGN trailers and exclusive-use, that did not match the way in which the trailers were loaded. This led to complaints by trucking companies with which ULOC did business, as well as from personnel at delivery destinations.

36. To conceal this fraud and eliminate complaints, which could expose the scheme, WHITMAN directed Durham to alter government paperwork. For example, WHITMAN instructed Durham to alter GBLs by hand and prepare substitute ULOC bills of lading reflecting the unauthorized revised specifications. When these techniques failed to fully abate complaints, WHITMAN directed Durham to alter GBLs using a computer program and photocopy machine, which assured that they maintained the appearance of authenticity.

37. To further conceal ULOC's fraudulent activity, Durham sometimes certified the completion of freight transportation services to DLA and Company A on PowerTrack/Syncada before shipments were actually delivered.

**Execution of the Scheme**

38. On or about the dates listed below, in the Middle District of Georgia and elsewhere, WHITMAN, Durham, Potts, Philpot, MCCARTY, and others known and unknown, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds, that is, electronic payments to a ULOC bank account, account number XXXXXXX4181, processed by PowerTrack/Syncada, as follows:

| Count | Date of Wire | Government Bill of Lading | Approximate Amount |
|---|---|---|---|
| 1 | April 29, 2009 | 108019AG | $5,228.77 |
| 2 | May 18, 2009 | 108807AG | $10,143.24 |
| 3 | June 18, 2009 | 110136AG | $9,878.90 |
| 4 | July 31, 2009 | 112466AG | $1,244.81 |
| 5 | August 17, 2009 | 112665AG | $21,865.66 |

| **Count** | **Date of Wire** | **Government Bill of Lading** | **Approximate Amount** |
|---|---|---|---|
| 6 | September 22, 2009 | 114228AG | $14,285.81 |
| 7 | October 29, 2009 | 115719AG | $11,507.26 |
| 8 | January 11, 2010 | 119517AG | $15,641.42 |
| 9 | March 2, 2010 | 120999AG | $9,634.37 |
| 10 | July 27, 2010 | 128939AG | $12,200.00 |
| 11 | August 5, 2010 | 129512AG | $9,367.95 |
| 12 | November 30, 2010 | 10A0BUAG | $9,114.53 |
| 13 | December 6, 2010 | 10A0CTAG | $9,430.13 |
| 14 | June 2, 2011 | 11A5HKAG | $9,697.87 |
| 15 | June 17, 2011 | 11A605AG | $9,285.12 |
| 16 | June 30, 2011 | 11A60LAG | $9,383.33 |
| 17 | July 5, 2011 | 11A68FAG | $9,285.12 |
| 18 | July 28, 2011 | 11A7E0AG | $9,945.41 |
| 19 | August 2, 2011 | 11A7D8AG | $9,559.82 |
| 20 | August 2, 2011 | 11A7DBAG | $9,559.82 |
| 21 | August 25, 2011 | 11A869AG | $10,660.03 |
| 22 | August 25, 2011 | 11A86AAG | $10,660.03 |
| 23 | August 25, 2011 | 11A86BAG | $10,660.03 |
| 24 | November 7, 2011 | 11A869AGR | $9,500.00 |
| 25 | November 7, 2011 | 11A86AAGR | $6,500.00 |
| 26 | November 7, 2011 | 11A86BAGR | $6,500.00 |
| 27 | November 8, 2011 | 11AAMMAG | $9,411.60 |
| 28 | November 21, 2011 | 11ABRKAG | $1,414.21 |
| 29 | December 8, 2011 | 11ABQ6AG | $1,414.21 |
| 30 | June 18, 2012 | 12A3YVAG | $5,121.11 |

All in violation of Title 18 United States Code, Sections 1343 and 1346.

**<u>COUNT THIRTY-ONE</u>**
**(Bribery—18 U.S.C. § 201(b)(1))**

39. Paragraphs 1-38 are incorporated by reference as though fully set forth herein.

40. From in or about January 2008 and continuing through to in or about May 2012, in the Middle District of Georgia, and elsewhere, the defendant,

**CHRISTOPHER WHITMAN,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States, and to induce such public official to do and omit to do any act in violation of the public official's lawful duty; that is, WHITMAN gave Potts money, gifts, housing, meals, and other things of value, as described in paragraph 24, in exchange for Potts's performance of official acts favorable to ULOC.

All in violation of Title 18, United States Code, Section 201.

**<u>COUNT THIRTY-TWO</u>**
**(Bribery—18 U.S.C. § 201(b)(1))**

41. Paragraphs 1–38 are incorporated by reference as though fully set forth herein.

42. From in or about May 2009 and continuing through to in or about May 2012, in the Middle District of Georgia, and elsewhere, the defendant,

**CHRISTOPHER WHITMAN,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and

to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States, and to induce such public official to do and omit to do any act in violation of the public official's lawful duty; that is, WHITMAN gave Philpot money, gifts, rare coins, firearms, collectibles, automobiles, meals, and other things of value, as described in paragraphs 25 and 26, in exchange for Philpot's performance of official acts favorable to ULOC.

All in violation of Title 18, United States Code, Section 201.

**COUNT THIRTY-THREE**
**(Bribery—18 U.S.C. § 201(b)(1))**

43. Paragraphs 1-38 are incorporated by reference as though fully set forth herein.

44. From in or about February 2010 and continuing through to in or about May 2012, in the Middle District of Georgia, and elsewhere, the defendant,

**CHRISTOPHER WHITMAN,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States, and to induce such public official to do and omit to do any act in violation of the public official's lawful duty; that is, WHITMAN gave MCCARTY money, gifts, housing, automobiles, meals, and other things of value, as described in paragraph 27, in exchange for MCCARTY's performance of official acts favorable to ULOC.

All in violation of Title 18, United States Code, Section 201.

**COUNT THIRTY-FOUR**
**(Bribery—18 U.S.C. § 201(b)(2))**

45. Paragraphs 1-38 are incorporated by reference as though fully set forth herein.

46. From in or about February 2010 and continuing through to in or about May 2012, in the Middle District of Georgia, and elsewhere, the defendant,

**SHAWN MCCARTY,**

being a public official, did directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official act, being influenced to commit and aid in committing, and to collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, and being induced to do and omit to do any act in violation of his official duty; that is, MCCARTY accepted money, gifts, housing, automobiles, meals, and other things of value, as described in paragraph 27, from WHITMAN, in exchange for performing official acts favorable to ULOC.

All in violation of Title 18, United States Code, Section 201.

**THE THEFT SCHEME**

**COUNTS THIRTY-FIVE THROUGH FORTY-SEVEN**
**(Scheme to Deprive the United States of Money, Property, and Honest Services by Wire Fraud – 18 U.S.C. §§ 1343, 1346)**

47. From in or about March 2010 and continuing through to in or about June 2012, in the Middle District of Georgia, and elsewhere, the defendants,

**CHRISTOPHER WHITMAN and**
**BRADFORD NEWELL,**

and Janes, and others known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud the United States, including DOD and its components, of money and property, and to defraud and deprive the United States, including DOD and its components, and the

citizens of the United States of their right to the honest services of public officials Janes and NEWELL through bribery.

**Purpose of the Scheme**

48. The purpose of the scheme was:

a. For WHITMAN to enrich himself and others through corruption and theft by offering and providing things of value, including money, to FSD public officials in exchange for official action to help steal USMC surplus equipment from MCLB-Albany;

b. For Janes and NEWELL to use their official positions with DLA to enrich themselves through corruption and theft by soliciting and accepting things of value from WHITMAN, in exchange for official actions to identify surplus USMC equipment in serviceable condition and to steal it from MCLB-Albany; and

c. For WHITMAN to enrich himself and others through fraud by selling stolen surplus USMC equipment, including bulldozers, cranes, and front-end loaders.

**Manner and Means**

49. The manner and means of the scheme included, but were not limited to the following:

a. WHITMAN identified FSD public officials in a position to help steal surplus USMC equipment from MCLB-Albany;

b. WHITMAN corrupted FSD by giving things of value to public officials Janes and NEWELL in exchange for official action to identify surplus USMC equipment in serviceable condition and steal it from MCLB-Albany;

c. Janes and NEWELL used their official positions to defraud DOD by identifying surplus USMC equipment in serviceable condition, including bulldozers, cranes, and front-end loaders, and helping WHITMAN steal it from MCLB-Albany;

d. WHITMAN and Smith improved the stolen surplus equipment and concealed that it had been stolen, so that it could be sold on the open market; and

e. Smith brokered sales of the stolen surplus USMC equipment to local and interstate purchasers and shared the proceeds with WHITMAN.

**Bribes Given to Public Officials**

50. On or about the dates listed below, WHITMAN gave Janes approximately $98,670. Approximately $74,670 of those payments were in the form of checks made payable to Janes or his company, Studhaven Farms. The checks, written from a ULOC bank account, account number XXXXXXX4181, were oftentimes sequenced with checks for similar or identical amounts payable to NEWELL's company, B&C Sporting Goods. Some of these payments were delivered to Janes by NEWELL. These cash and check payments include, but are not limited to, the following:

| ¶ 50 | Date of Deposit | Date of Check | ULOC Check No. | Check Payee (or Cash) | Approx. Amount |
|---|---|---|---|---|---|
| a. | March 19, 2010 | n/a | n/a | (Cash) | $5,000 |
| b. | April 14, 2010 | n/a | n/a | (Cash) | $9,000 |
| c. | May 20, 2010 | n/a | n/a | (Cash) | $10,000 |
| d. | August 25, 2010 | August 24, 2010 | 4577 | Shelby Janes | $7,335 |
| e. | August 25, 2010 | August 24, 2010 | 4578 | Studhaven Farms | $8,000 |
| f. | September 8, 2010 | September 2, 2010 | 4690 | Shelby Janes | $13,335 |
| g. | October 29, 2010 | October 27, 2010 | 5049 | Studhaven Farms | $10,000 |

| **¶ 50** | **Date of Deposit** | **Date of Check** | **ULOC Check No.** | **Check Payee (or Cash)** | **Approx. Amount** |
|---|---|---|---|---|---|
| h. | December 13, 2010 | December 9, 2010 | 5441 | Studhaven Farms | $5,000 |
| i. | December 30, 2010 | December 27, 2010 | 5566 | Studhaven Farms | $5,000 |
| j. | December 30, 2010 | December 27, 2010 | 5567 | Studhaven Farms | $2,500 |
| k. | December 30, 2010 | December 27, 2010 | 5568 | Studhaven Farms | $3,500 |
| l. | January 12, 2011 | December 6, 2010 | 5683 | Studhaven Farms | $5,000 |
| m. | January 12, 2011 | December 6, 2010 | 5684 | Studhaven Farms | $5,000 |
| n. | January 12, 2011 | December 6, 2010 | 5685 | Studhaven Farms | $5,000 |
| o. | March 7, 2011 | March 2, 2011 | 5905 | Studhaven Farms | $5,000 |

51. On or about the dates listed below, WHITMAN gave NEWELL approximately $114,970. Approximately $74,670 of those payments were in the form of checks made payable to NEWELL's company, B&C Sporting Goods. The checks, written from a ULOC bank account, account number XXXXXXX4181, were oftentimes sequenced with checks for similar or identical amounts payable to Janes or his company, Studhaven Farms. These cash and check payments include, but are not limited to, the following:

| **¶ 51** | **Date of Deposit** | **Date of Check** | **ULOC Check No.** | **Check Payee (or Cash)** | **Approx. Amount** |
|---|---|---|---|---|---|
| a. | March 25, 2010 | n/a | n/a | (Cash) | $27,000 |
| b. | April 6, 2010 | n/a | n/a | (Cash) | $6,000 |
| c. | May 11, 2010 | n/a | n/a | (Cash) | $1,000 |
| d. | May 12, 2010 | n/a | n/a | (Cash) | $4,300 |
| e. | May 25, 2010 | n/a | n/a | (Cash) | $600 |
| f. | May 25, 2010 | n/a | n/a | (Cash) | $1,400 |

| ¶ 51 | Date of Deposit | Date of Check | ULOC Check No. | Check Payee (or Cash) | Approx. Amount |
|---|---|---|---|---|---|
| g. | August 19, 2010 | August 19, 2010 | 4563 | B&C Sporting Goods | $15,335 |
| h. | September 8, 2010 | September 2, 2010 | 4689 | B&C Sporting Goods | $13,335 |
| i. | October 28, 2010 | October 27, 2010 | 5048 | B&C Sporting Goods | $10,000 |
| j. | December 13, 2010 | December 9, 2010 | 5440 | B&C Sporting Goods | $16,000 |
| k. | January 13, 2011 | January 3, 2011 | 5680 | B&C Sporting Goods | $5,000 |
| l. | January 18, 2011 | January 7, 2011 | 5681 | B&C Sporting Goods | $5,000 |
| m. | January 15, 2011 | January 7, 2011 | 5682 | B&C Sporting Goods | $5,000 |
| n. | March 3, 2011 | March 2, 2011 | 5904 | B&C Sporting Goods | $5,000 |

52. To conceal WHITMAN's corrupt relationship with Janes and NEWELL, the things of value described in paragraphs 50 and 51 were recorded in the ULOC general ledger as loans or transportation costs and other business related expenses.

**Official Acts and Theft of Surplus USMC Equipment**

53. Between in or about March 2010 and in or about December 2010, in exchange for the things of value promised and provided by WHITMAN, set forth in paragraphs 50 and 51, Janes and NEWELL performed official acts, including but not limited to the following:

a. Janes and NEWELL selected surplus USMC equipment, including bulldozers, cranes and front-end loaders, in serviceable condition from USMC's inventory to give to WHITMAN;

b. Janes and NEWELL instructed WHITMAN and his agents where the surplus USMC equipment they had selected to release was located;

c. Janes filled out DOD Form 1348s authorizing the release of surplus USMC equipment to WHITMAN and his agents;

d. Janes and NEWELL instructed DLA Load Technicians to load surplus USMC equipment onto trailers provided by WHITMAN, so that it could be transported off of MCLB-Albany;

e. NEWELL helped load surplus USMC equipment onto trailers provided by WHITMAN, including using his truck and jumper cables to start the engines of equipment that did not work properly;

f. NEWELL gave WHITMAN spare parts and accessories from surplus inventory to improve the functionality of USMC equipment that he and Janes helped WHITMAN steal from MCLB-Albany;

g. NEWELL permitted a ULOC employee to drive 25-ton cranes, which he had selected from USMC inventory to give to WHITMAN, out of MCLB-Albany's back gate to transport it to ULOC's storage yard;

54. Janes and NEWELL used their official positions to facilitate WHITMAN's theft of approximately 31 items of surplus USMC equipment, including bulldozers, cranes, and front-end loaders, which are further identified in paragraph 58.

55. In or about March 2010, WHITMAN converted at least one front-end loader that he stole from MCLB-Albany for use at ULOC's storage yard. This front-end loader was used to load and unload freight in connection with ULOC's transportation business and the fraud scheme set forth in paragraphs 21 to 38.

56. Between in or about March 2010 and in or about March 2011, WHITMAN enlisted Smith's assistance to broker sales of the stolen surplus USMC equipment. Smith agreed to do so, in exchange for a share of the sales proceeds.

57. Between in or about March 2010 and in or about March 2011, WHITMAN and Smith repaired, refurbished, repainted, and otherwise improved certain stolen surplus USMC equipment to prepare it for sale. For example, WHITMAN and Smith had some of the stolen equipment painted from military green to factory yellow and outfitted it with manufacturer decals to lend the appearance that the equipment was not military surplus equipment.

58. On or about the dates listed below, WHITMAN and Smith sold approximately 30 pieces of stolen surplus USMC equipment for a total of approximately $1,108,800, as follows:

| ¶ 58 | Date of Sale | USMC Item (Identification No.) | Purchaser | Approximate Sale Price |
|---|---|---|---|---|
| a. | March 17, 2010 | John Deere Front-End Loader (528142) | PURCHASER A, Fair Port, NY | $41,500 |
| b. | April 12, 2010 | CAT D7G Bulldozer (4YB00115) | PURCHASER B, Palestine, AK | $81,900 |
| c. | April 12, 2010 | CAT D7G Bulldozer (4YB00219) | PURCHASER B, Palestine, AK | Included in ¶ 58(b) |
| d. | May 6, 2010 | John Deere Front-End Loader (526600) | PURCHASER C, Moultrie, GA | $34,000 |
| e. | May 14, 2010 | John Deere Front-End Loader (523277) | PURCHASER D, Bainbridge, GA | $36,000 |
| f. | May 20, 2010 | John Deere Front-End Loader (529109) | PURCHASER C, Moultrie, GA | $37,800 |
| g. | May 27, 2010 | PNH 25-ton Crane (55395) | PURCHASER E, Gadsden, AL | $35,000 |
| h. | June 10, 2010 | PNH 25-ton Crane (53349) | PURCHASER E, Gadsden, AL | $35,000 |

| ¶ 58 | Date of Sale | USMC Item (Identification No.) | Purchaser | Approximate Sale Price |
|---|---|---|---|---|
| i. | June 11, 2010 | PNH 25-ton Crane (55284) | PURCHASER E, Gadsden, AL | $35,000 |
| j. | June 17, 2010 | Lulh Forklift (DIM10F7-654) | PURCHASER E, Gadsden, AL | $12,500 |
| k. | July 13, 2010 | CAT D7G Bulldozer (4YB00314) | PURCHASER E, Gadsden, AL | $38,500 |
| l. | July 27, 2010 | CAT D7G Bulldozer (4YB00241) | PURCHASER E, Gadsden, AL | $38,500 |
| m. | August 11, 2010 | John Deere Front-End Loader (521427) | PURCHASER C, Moultrie, GA | $36,000 |
| n. | August 19, 2010 | Pettibone Yard Crane (B7777P) | PURCHASER E, Gadsden, AL | $29,500 |
| o. | August 19, 2010 | Pettibone Yard Crane (B7765P) | PURCHASER E, Gadsden, AL | Included in ¶ 58(n) |
| p. | August 19, 2010 | Terex Yard Crane (572169) | PURCHASER E, Gadsden, AL | Included in ¶ 58(n) |
| q. | August 19, 2010 | John Deere Front-End Loader (523750) | PURCHASER F, Metter, GA | $40,000 |
| r. | August 30, 2010 | John Deere Front-End Loader (528049) | PURCHASER G, Norman Park, GA | $45,000 |
| s. | August 30, 2010 | John Deere Front-End Loader (522960) | PURCHASER H, Norman Park, GA | $45,000 |
| t. | October 26, 2010 | CAT D7G Bulldozer (4YB00078) (522192) | PURCHASER E, Gadsden, AL | $35,000 |
| u. | November 4, 2010 | CAT D7G Bulldozer (4YB00231-R) | PURCHASER E, Gadsden, AL | $40,000 |
| v. | November 29, 2010 | John Deere Front-End Loader (524769) | PURCHASER I, Albany, GA | $52,500 |
| w. | November 30, 2010 | John Deere Front-End Loader (528018) | PURCHASER I, Albany, GA | $52,500 |

| ¶ 58 | Date of Sale | USMC Item (Identification No.) | Purchaser | Approximate Sale Price |
|---|---|---|---|---|
| x. | January 10, 2011 | CAT D7G Bulldozers (4YB00297) | PURCHASER E, Gadsden, AL | $91,200 |
| y. | January 10, 2011 | CAT D7G Bulldozers (4YB00196) | PURCHASER E, Gadsden, AL | Included in ¶ 58(x) |
| z. | January 12, 2011 | John Deere Front-End Loader (527857) | PURCHASER J, Dothan, AL | $58,400 |
| aa. | February 17, 2011 | John Deere Front-End Loader (526513) | PURCHASER J, Dothan, AL | $52,000 |
| bb. | March 25, 2011 | PNH 25-ton Crane (55293) | PURCHASER J, Dothan, AL | $86,000 |
| cc. | March 25, 2011 | PNH 25-ton Crane (55270) | PURCHASER J, Dothan, AL | Included in ¶ 58(bb) |
| dd. | June 27, 2012 | John Deere Front-End Loader (523113) | PURCHASER C, Moultrie, GA | $20,000 |
| ee. | n/a | John Deere Front-End Loader (526702) | n/a | n/a |

59. On or about April 27, 2012, just days after WHITMAN became aware of a law enforcement investigation, ULOC transported two front-end loaders, identified in subparagraphs 58(dd) and 58(ee), along with military connex boxes and a portable water pump, to Smith's property in Moultrie, Georgia. Approximately two months later, on or about June 27, 2012, Smith sold one of the front-end loaders for $20,000, identified in subparagraph 58(dd), which he kept for himself. Smith kept the other front-end loader, identified in subparagraph 58(ee), and the connex boxes and water pump.

**Execution of the Scheme**

60. On or about the dates listed below, in the Middle District of Georgia and elsewhere, WHITMAN, NEWELL, Janes, and Smith, for the purpose of executing the above-described scheme

and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds, that is, electronic payments to Smith's bank account, account number XXXXXX1502, in connection with the purchase of equipment identified in paragraph 58:

| **Count** | **Date of Wire** | **Purchaser** | **Equipment (¶ 58)** | **Approx. Amount** | **Wire Transfer No.** |
|---|---|---|---|---|---|
| 35 | March 17, 2010 | PURCHASER A | 58(a) | $41,500 | 2612463 |
| 36 | March 29, 2010 | PURCHASER B | 58(b)<br>58(c) | $10,000 | 2651404 |
| 37 | April 12, 2010 | PURCHASER B | 58(b)<br>58(c) | $71,900 | 2707317 |
| 38 | May 27, 2010 | PURCHASER E | 58(g) | $35,000 | 2892419 |
| 39 | June 10, 2010 | PURCHASER E | 58(h) | $35,000 | 2953847 |
| 40 | June 11, 2010 | PURCHASER E | 58(i) | $35,000 | 2956202 |
| 41 | June 17, 2010 | PURCHASER E | 58(j) | $12,500 | 2984155 |
| 42 | July 13, 2010 | PURCHASER E | 58(k) | $38,500 | 3087873 |
| 43 | July 27, 2010 | PURCHASER E | 58(l) | $38,500 | 3143345 |
| 44 | August 19, 2010 | PURCHASER E | 58(n)<br>58(o)<br>58(p) | $29,500 | 3249509 |
| 45 | October 26, 2010 | PURCHASER E | 58(t) | $35,000 | 3543851 |
| 46 | November 4, 2010 | PURCHASER E | 58(u) | $40,000 | 3593937 |
| 47 | January 10, 2011 | PURCHASER E | 58(x)<br>58(y) | $91,200 | 3888466 |

All in violation of Title 18 United States Code, Sections 1343 and 1346.

**COUNT FORTY-EIGHT**
**(Bribery—18 U.S.C. § 201(b)(1))**

61. Paragraphs 1-20 and 47-60 are incorporated by reference as though fully set forth herein.

62. From in or about March 2010 and continuing through to in or about March 2011, in the Middle District of Georgia, and elsewhere, the defendant,

**CHRISTOPHER WHITMAN,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States, and to induce such public official to do and omit to do any act in violation of the public official's lawful duty; that is, WHITMAN gave Janes money and other things of value as described in paragraph 50, in exchange for Janes using his official position to facilitate the theft of surplus USMC equipment, including bulldozers, cranes, and front-end loaders, from the United States and DOD, including its components.

All in violation of Title 18, United States Code, Section 201.

**COUNT FORTY-NINE**
**(Bribery—18 U.S.C. § 201(b)(1))**

63. Paragraphs 1-20 and 47-60 are incorporated by reference as though fully set forth herein.

64. From in or about March 2010 and continuing through to in or about March 2011, in the Middle District of Georgia, and elsewhere, the defendant,

**CHRISTOPHER WHITMAN,**

did, directly and indirectly, corruptly give, offer, and promise a thing of value to a public official, to influence any official act, to influence such public official to commit and aid in committing, and to collude in, and allow, any fraud, and to make opportunity for the commission of any fraud on the United States, and to induce such public official to do and omit to do any act in violation of the public official's lawful duty; that is, WHITMAN gave NEWELL money and other things of value as described in paragraph 51, in exchange for NEWELL using his official position to facilitate the theft of surplus USMC equipment, including bulldozers, cranes, and front-end loaders, from the United States and DOD, including its components.

All in violation of Title 18, United States Code, Section 201.

**COUNT FIFTY**
**(Bribery—18 U.S.C. § 201(b)(2))**

65. Paragraphs 1-20 and 47-60 are incorporated by reference as though fully set forth herein.

66. From in or about March 2010 and continuing through to in or about March 2011, in the Middle District of Georgia, and elsewhere, the defendant,

**BRADFORD NEWELL,**

being a public official, did directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of any official act, being influenced to commit and aid in committing, and to collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, and being induced to do and omit to do any act in violation of his

official duty; that is, NEWELL accepted money and other things of value as described in paragraph 51 from WHITMAN, in exchange for using his official position to facilitate the theft of surplus USMC equipment, including bulldozers, cranes, and front-end loaders, from the United States and DOD, including its components.

All in violation of Title 18, United States Code, Section 201.

**COUNT FIFTY-ONE**
**(Theft of Government Property—18 U.S.C. § 641)**

67. Paragraphs 1-20 and 21-38 are incorporated by reference as though fully set forth herein.

68. From in or about March 2010 and continuing through to June 2012, in the Middle District of Georgia, and elsewhere, the defendants,

**CHRISTOPHER WHITMAN and**
**BRADFORD NEWELL,**

and Janes, did embezzle, steal, purloin, and knowingly convert to their use and the use of another, and did steal, convey, and dispose of, without authority, anything of value of the United States or any department or agency thereof, that is, approximately thirty-one (31) pieces of surplus USMC equipment, including bulldozers, cranes, and front-end loaders, as set forth in paragraph 58, valued at more than $1,000, owned by the United States and DOD, including its components, and did receive, conceal, and retain the same with intent to convert it to their use and gain, knowing it to have been embezzled, stolen, purloined, and converted.

All in violation of Title 18, United States Code, Sections 641 and 2.

**FORFEITURE NOTICE**
**(18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461 – Criminal Forfeiture)**

69. The allegations contained in Counts One through Fifty-One and Paragraphs 1 through 68 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

70. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), upon conviction of the offense(s) in violation of Title 18, United States Code, Sections 1343 and 1346, set forth in Counts One through Thirty and Thirty-Five through Forty-Seven; conviction of the offense(s) in violation of Title 18, United States Code, Section 201, set forth in Counts Thirty-One through Thirty-Four and Forty-Eight through Fifty; and conviction of the offense(s) in violation of Title 18, United States Code, Section 641, set forth in Count Fifty-One this Indictment, the defendants,

**CHRISTOPHER WHITMAN,**
**SHAWN MCCARTY, and**
**BRADFORD NEWELL,**

shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said violations. The property to be forfeited includes, but is not limited to, the following:

a. A sum of money, the amount to be determined, in United States currency representing the total amount of proceeds traceable, directly or indirectly, to the offense(s) in violation of Title 18, United States Code, Sections 201(b), 641, and 1343; and

b. All real and personal property identified in Civil Case No. 1:13-CV-00015 (WLS), filed in the Middle District of Georgia, Albany Division, captioned *United States of America v. One Parcel of Real Property and Improvements, Located at 1145 E. Broad Avenue, Albany, Dougherty County, Georgia, et al.*

71. If any of the property described above, as a result of any act or omission of the defendant(s):

a. Cannot be located upon the exercise of due diligence;

b. Has been transferred or sold to, or deposited with, a third party;

c. Has been placed beyond the jurisdiction of the court;

d. Has been substantially diminished in value; or

e. Has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL.

S/

FOREPERSON OF THE GRAND JURY

Presented by:

JACK SMITH, Chief
Public Integrity Section
Criminal Division
United States Department of Justice

RICHARD B. EVANS
Trial Attorney

J.P. COONEY
Trial Attorney

MICHAEL J. MOORE, United States Attorney
United States Attorney's Office
Middle District of Georgia

K. ALAN DASHER
Assistant United States Attorney

Filed under seal this sixteenth day of January, 2014.

Carston
Clerk

5:24 P
1-14 14
Carston